### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **Danielle Telesford, *et al.*,** | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | **Civil No. 13-cv-01359 (APM-DAR)** |
| **Maryland Provo-I Medical Services, P.C., *et al.*,** | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Plaintiffs in this case—seven African-American certified physicians' assistants—filed this lawsuit against their employer, Maryland Provo-I Medical Services, P.C.; a related management-services entity, EmCare, Inc.; and two individuals, alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, as well as common law breach of contract.   Plaintiffs assert that Defendants' failure to promote any of them for a supervisory position was discriminatory and that Defendants subsequently retaliated against them for filing discrimination complaints by threatening them with termination.   One Plaintiff additionally asserts that she actually was terminated because of protected activity.

This matter is before the court on Defendants' Motion for Summary Judgment.   Having reviewed the pleadings and evidence, the court finds that a reasonable jury could conclude that Defendants EmCare and Maryland Provo-I Medical Services discriminated against Plaintiffs during the promotion process.   The court further concludes that Plaintiffs' Title VII discrimination claims against Defendants Jennifer Korando and Adam Brown must be dismissed, but that their

Section 1981 discrimination claim may proceed against Brown only. Finally, the court finds that no reasonable jury could conclude that Defendants retaliated against Plaintiffs or breached their contractual obligations to Plaintiffs. Accordingly, the court grants in part and denies in part Defendants' Motion for Summary Judgment.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   *The United Medical Center's Emergency Department*

United Medical Center ("United") is a not-for-profit hospital corporation located in the District of Columbia. Complaint, ECF No. 1 [hereinafter Compl.], ¶ 7. United's Emergency Department ("ED") is divided into two sections:  (1) the "Core" section for patients with more serious medical conditions who require immediate attention by an emergency room physician, and (2) the "Fast Track" section for all other patients. Defs.' Stmt. of Material Facts, ECF No. 40-2 [hereinafter Defs.' Stmt.], ¶ 4.[1]  Those patients assigned to the Fast Track are first treated by a physician's assistant ("PA") who conducts a preliminary evaluation of those patients and provides an initial recommendation (*e.g.,* discharging with a prescription, admitting to the hospital, etc.). *Id*. ¶¶ 4-6. The responsible PA documents the services provided on the patient's medical chart and then gives the chart to the responsible physician for review and submission to a billing company for reimbursement. *Id*. ¶¶ 6-8. The billing company reviews the chart and assigns the patient's treatment a Relative Value Unit ("RVU")—a unit of measurement designed to account for the seriousness of the condition treated and the relative complexity of the treatment provided—which

---

[1] Plaintiffs did not strictly comply with Local Civil Rule 7(h) in responding to Defendants' Statement of Material Facts. *See generally* Pls.' Opp'n to Defs.' Mot. for Summ. Judg., ECF No. 41 [hereinafter Pls.' Opp'n], at 11-27.  For example, when Plaintiffs denied a factual averment, they did not cite to a portion of the record to support their denial, thereby making it difficult to discern whether they dispute a fact or not, based on actual record evidence.  As a consequence, the paragraphs from Defendants' Statement of Material Facts to which the court cites are those that the court considers admitted, unless otherwise noted.

is then provided to the patient's insurance provider so that the insurance provider can calculate the amount that United will be reimbursed.  *Id.* ¶¶ 9-10.

In 2009, United contracted with EmCare, Inc. ("EmCare"), to provide doctors and PAs to operate United's ED.  *Id.* ¶ 15, 103.  EmCare, in turn, entered into an agreement with Defendant Maryland Provo-I Medical Services, P.C. ("Provo"), to provide the necessary staff for United.  *Id.* ¶¶ 31-32.  The United-EmCare contract took effect on June 1, 2009.  *Id.* ¶ 103.  Before the contract began, a recruiter employed by EmCare, Defendant Jennifer Korando, began negotiating with the PAs and doctors already working at United to secure an agreement that would allow them to continue to work in the ED, but as employees of Provo.  *Id.* ¶ 26.

Provo originally offered to compensate existing PAs at a lower hourly rate than they previously had been paid, but to supplement their salaries with a bonus based on the composite RVU of the treatments provided.  *Id.*  This compensation package, according to Defendants, was designed to incentivize higher performance.  *Id.* ¶¶ 26-27.  When it became clear, however, that the existing PAs would not accept such a compensation structure, Provo agreed to allow them to remain at their original hourly rate.  *Id.* ¶ 26.  Provo, however, required all newly hired PAs to accept the RVU-based compensation structure.  *Id.* ¶ 105.  In addition, each contract between Provo and its PAs—both with existing and new employees—contained a termination clause providing for "at will" termination by either party.  *Id.* ¶ 107.

### 2. *Dr. Adam Brown and the Lead-PA Position*

In early 2012, EmCare hired Defendant Dr. Adam Brown—a white male—as Medical Director for the ED.  Defs.' Stmt. ¶¶ 17-19.  During the interview process, United hospital officials expressed to Brown their concerns about the department's performance in several areas, including quality of care, length of patient stay, and other health care provider metrics.  *Id.* ¶¶ 20-21.

Following his hire, Brown sent a memo to ED personnel outlining his four goals: (1) reducing patient length-of-stay; (2) improving patient satisfaction; (3) improving physician and PA productivity; and (4) improving quality improvement metrics.  *Id.* ¶ 85.

On July 8, 2016, Plaintiffs—all of whom are African-American PAs and are current or former employees of Provo in the United ED[2]—received an email from Nathan Madsen, a white male, part-time PA with Provo, informing them that he had been offered and would be accepting a newly created Lead-PA position in the ED.  Pls.' Opp'n Ex. 6, July 8, 2016, e-mail from Nate Madsen, ECF No. 41-2, at 86.  This was the first time Plaintiffs were made aware of this new position, as neither EmCare nor Provo had formally advertised the position nor published a job description until after Madsen was hired.  Pls.' Opp'n at 46-47.

The creation of the Lead-PA position and the decision to award the position to Madsen form the basis for Plaintiffs' discrimination claims.  Defendants assert that Brown, the ED Medical Director, first came up with the idea of creating the Lead-PA position in February 2012—nearly six months before he arrived at the United ED.  Defs.' Stmt. ¶ 84.  According to Brown, he selected Madsen based on his qualifications after (1) soliciting recommendations from Korando, the EmCare recruiter, and (2) reviewing the resumes and performance metrics of all PAs, which he had obtained from Korando.  *Id.* ¶¶ 86-87.  Korando recommended Plaintiff Chandon-Cooke and Madsen for the position.  *Id.*  Brown asserts that, based on his review, he narrowed his focus to three candidates—Plaintiff Chandon-Cooke, Plaintiff Telesford, and Madsen.  *Id.* ¶ 87.  Brown ultimately selected Madsen because, in his view, he possessed the strongest metrics of all the PAs, including having the shortest average length-of-stay per patient, seeing the most patients per hour,

---

[2] The Plaintiffs are:  Danielle Telesford, Andre Campbell, Shona Chandon-Cooke, Cheree Jaimson, Hudson Nsubuga, Monique Ofwono, and Michael Tesfazion.

and generating the highest number of RVUs per hour. *Id.* ¶ 90. Plaintiffs dispute Madsen's relative

qualifications.[3] Pls.' Opp'n at 45-49, 57-62.

In the months following Madsen's promotion, Plaintiffs grew increasingly upset about his

hiring. Starting first on September 7, 2012, and continuing until October 1, 2012, each Plaintiff

filed a separate Discrimination Charge with the Equal Employment Opportunity Commission

("EEOC") alleging that he or she was discriminated against during the promotion process. Defs.'

Stmt. ¶¶ 125-26, 128, 130, 132, 134, 136, 138.

### 3.   *The Change in the PA Compensation Structure*

Meanwhile, on May 23, 2012, a group of PAs—including Madsen and Plaintiffs—sent

Korando a joint letter requesting a pay raise. *Id.* ¶ 108. Korando advised the PAs that she had

discussed the request with Brown and that no action was likely to occur before Brown's official

start as the ED Medical Director in July. *Id.* ¶ 111.

At a staff meeting on August 1, 2012, Brown announced a new pay structure for PAs. *Id.*

¶ 116. Effective September 1, 2012, PAs would be compensated at an hourly rate supplemented

by both an RVU-based and a "citizenship" bonus, which could be earned by meeting certain RVU-

based performance metrics and by participating in various hospital activities. *Id.* Before EmCare

implemented the pay restructuring, it presented each Plaintiff with an analysis showing that, under

the new system, each would receive an increase in his or her effective hourly rate of pay. *Id.* ¶ 118.

Despite these assurances, some of the PAs expressed dissatisfaction with the proposed

changes to the compensation system. *Id.* ¶ 122. Thereafter, Brown announced that any PA who

---

[3] The court need not delve into the specifics of the parties' dispute regarding Madsen's relative qualifications for reasons that will become apparent.

refused to agree to the new compensation structure would be considered to have resigned pursuant to the "at-will" termination clause in their employment contract. *Id*.

By mid-November, EmCare relented in its insistence that all PAs be subject to the new pay structure. By email dated November 20, 2012, an EmCare executive explained that the company should have obtained written permission from each PA before implementing the new system. *Id*. ¶ 123. He then offered each PA the opportunity to either elect to receive compensation under the new system or remain under the old one. *Id*. EmCare also offered to reimburse, with interest, any amount that an employee had not received, but which they were entitled to receive, under the original pay structure. *Id*. Each Plaintiff opted to remain under the old system, *id*. ¶ 124, and Plaintiffs Telesford, Ofwono, and Chandon-Cooke were all subsequently reimbursed for their lost wages, *id*.¶¶ 50, 68, 83.

Starting on November 14, 2012, each Plaintiff filed a separate Charge of Discrimination with the EEOC alleging that the requirement that he or she agree to the proposed compensation structure, and Brown's invocation of the "at-will" termination clause in their employment contracts, constituted retaliation for the discrimination complaints they had filed relating to Madsen's promotion. *Id*. ¶¶ 126, 128, 130, 132, 134, 136, 138.

### 4.      *Plaintiff Ofwono's Termination*

On January 12, 2013, Plaintiff Ofwono informed Brown and the EmCare scheduler that she was too ill to work her shift. *Id*. ¶ 62. However, it later became apparent that Ofwono had actually worked the exact same shift at Southern Maryland Hospital. *Id*. ¶¶ 62-63. Upon discovering this, EmCare immediately terminated Ofwono. *Id*. On January 24, 2014, Ofwono

filed a separate Charge of Discrimination with the EEOC alleging that her termination was in retaliation for filing her Charges of Discrimination with the EEOC.  *Id.* ¶ 126.

### B.    Procedural Background

On September 9, 2013, Plaintiffs filed suit in this court, alleging:  (1) discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* [hereinafter Title VII] (Count 1); (2) discrimination in violation of 42 U.S.C. § 1981 [hereinafter Section 1981] (Count 2); and (3) common law breach of contract (Count 3).  *See generally* Compl.  Additionally, the Complaint asserted a claim of retaliation specific to Ofwono's termination.  Compl. ¶ 112.

On August 3, 2015, following discovery, Defendants filed a Motion for Summary Judgment, in which they argued that Plaintiffs were neither discriminated against nor retaliated against, and that no breach of contract had occurred.  *See generally* Defs.' Mem. in Supp. of Mot. for Summ. Judg, ECF No. 40-3 [hereinafter Defs.' Mot.].  Defendants argue that there were legitimate non-discriminatory reasons both for promoting Madsen and for implementing the new PA compensation system.  Moreover, they contend that they cured any alleged damages resulting from Brown's invocation of the "at-will" termination clause prior to litigation.

On September 1, 2015, Plaintiffs filed their Opposition to Defendant's Motion for Summary Judgment, claiming that Defendants' proffered non-discriminatory reasons for promoting Madsen were in fact pretext for discrimination.  *See generally* Pls.' Opp'n. Additionally, Plaintiffs argued that the new PA compensation structure—and invoking the "at-will" termination clause in an effort to coerce the PAs to accept that structure—constituted retaliation in response to their protected behavior.  *Id.*  On September 14, 2015, Defendants filed

a Reply to Plaintiffs' Opposition.  *See* Defs.' Reply in Supp. of Mot. for Summ. Judg., ECF No.

42 [hereinafter Defs.' Reply].

### III.    LEGAL STANDARD

Summary judgment will only be granted if the movant can show that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving

party, while a fact is "material" only if it is capable of affecting the outcome of litigation.  *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A non-material factual dispute is insufficient to

prevent the court from granting summary judgment.  *Id.*

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, [ ] on which that party will bear the burden of proof at

trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The party moving for summary

judgment "bears the initial responsibility of informing the district court of the basis for its motion"

and identifying those portions of the record that it believes "demonstrate the absence of a genuine

issue of material fact."  *Id.* at 323.

Once the moving party has made an adequate showing that a fact cannot be disputed, the

burden shifts to the party opposing summary judgment to "set forth specific facts showing that

there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (citation and internal quotations

omitted) (footnote omitted).  The nonmoving party may oppose the motion using "any of the kinds

of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from

this list that one would normally expect the nonmoving party to make the showing to which [the

Court has] referred."  *Celotex Corp.*, 477 U.S. at 324.  "The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citations omitted). However, "to defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex*, 477 U.S. at 324). In other words, if the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. Summary judgment, then, is appropriate when the non-moving party fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

## IV.   DISCUSSION

### A.   Discrimination Claims

#### 1.   *Entity Defendants Provo and EmCare*

The court first considers Plaintiffs' discrimination claims under both Title VII and Section 1981 against the entity defendants, Provo and EmCare. Under Title VII, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Nor may an employer "limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2). Under Section 1981, an employer may not "impair[]" an employee's right to "make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981. Here, in order for Plaintiffs' claims under Title VII and Section 1981 to survive summary

judgment, they must provide direct or circumstantial evidence of Defendants' discriminatory intent.

a.      <u>Direct evidence of discrimination</u>

Plaintiffs assert that they have provided direct evidence of discrimination. Pls.' Opp'n at 49. Such evidence, if it exists, "would generally entitle [plaintiffs] to a jury trial." *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1246-47 (D.C. Cir. 2011) (analyzing a case under the D.C. Human Rights Act, which is analyzed "in the same way that [the court] analyze[s] discrimination claims under the federal anti-discrimination laws"); *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 49-50 (D.D.C. 2011), *aff'd*, 685 F.3d 1096 (D.C. Cir. 2012) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). One example of direct evidence is "a statement that itself shows racial or gender bias in the [employment] decision." *Vatel*, 627 F.3d at 1247.

Plaintiffs point to comments made (1) by Korando complaining that "good behavior is seldom seen by [the PAs]," and (2) by EmCare officials informing Brown's African-American predecessor—upon his termination—that EmCare was "going in a different direction." Pls.' Opp'n at 49. But these two statements, without more, simply do not constitute direct evidence of discrimination. First, Korando was clearly complaining about the entire group of PAs—which included white, Latino, and African-American individuals—and Plaintiffs have provided no additional evidence that she was in any way singling out the African-American PAs. Second, the statement that EmCare was "going in a different direction" is simply too vague to rise to the level of direct evidence of discrimination, regardless of the fact that it was made in the context of firing an African-American employee.

Further, even if the court were to assume that these comments were racially motivated, they amount to no more than "stray remarks . . . unrelated to the decisional process." *Waterhouse*

10

*v. Dist. of Columbia*, 124 F. Supp. 2d 1, 12 (D.D.C. 2000) (internal quotations omitted). Such statements, made without "a clearly demonstrated nexus to the adverse employment action at issue"—Madsen's promotion—"are not alone sufficient to withstand a motion for summary judgment." *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 666 (D.D.C.), *aff'd sub nom. Kalekiristos v. C.T.F. Hotel Mgmt. Corp.*, 132 F.3d 1481 (D.C. Cir. 1997). Here, Plaintiffs do not even attempt to (and cannot) establish a sufficient nexus between these allegedly racist statements and the decision to promote Madsen.

b.   Circumstantial evidence of discrimination

Because there is no direct evidence sufficient to permit Plaintiffs to reach a trial, the court begins its review of Plaintiffs' circumstantial evidence. "Courts analyze Title VII and Section 1981 employment discrimination claims under similar legal standards." *Olatunji v. Dist. of Columbia*, 958 F. Supp. 2d 27, 31 (D.D.C. 2013). When a plaintiff proffers only indirect evidence of unlawful discrimination (as is the case here), courts analyze both Title VII and Section 1981 claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Weber v. Battista*, 494 F.3d 179, 182 (D.C. Cir. 2007); *Carney v. Am. Univ.*, 151 F.3d 1090, 1092-93 (D.C. Cir. 1998) (holding that "courts use the three-step *McDonnell Douglas* framework for establishing racial discrimination under Title VII" when "evaluat[ing] claims] under [Section 1981]").

Under *McDonnell Douglas,* it is the plaintiff's burden to establish a *prima facie* case of discrimination by a preponderance of the evidence. *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (citation omitted). This burden, however, "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the plaintiff establishes a *prima facie* case, the employer then must articulate a legitimate, non-discriminatory reason for its actions. *Stella,* 284 F.3d at 144.

If the employer proffers such a reason, the burden shifts back to the plaintiff to prove that the legitimate reason provided by the employer was in fact pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802-05.

In the summary judgment context, however, once an employer sets forth a legitimate, non-discriminatory reason for the employment action, "the question whether the employee actually made out a *prima facie* case is no longer relevant, and thus disappears and drops out of the picture." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008) (citations and internal quotations omitted); *see also Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016) ("At the summary judgment stage, once the employer has claimed a nondiscriminatory reason for its actions, this burden-shifting framework disappears."). At that point, the court must determine whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race" or some other prohibited ground. *Brady*, 520 F.3d at 494 (citations omitted); *Nurriddin*, 818 F.3d at 758 ("The 'one central inquiry' that remains is whether a reasonable jury could infer retaliation or discrimination from the evidence.") (citation omitted). Courts should consider this issue "in light of the total circumstances of the case," asking "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (citations omitted); *see also Nurriddin*, 818 F.3d at 759.

Here, Plaintiffs have presented sufficient evidence—mainly in the form of the deposition testimony of Dr. Janet Blackwood—to raise a triable issue of material fact as to whether Defendants' proffered non-discriminatory reason for promoting Madsen—that Brown selected him on the strength of his qualifications for the position—was pretext for discrimination. Pls.' Opp'n 45-46; Pls. Opp'n, Ex. 2, Deposition Transcript of Janet Blackwood [hereinafter Blackwood Dep.].   Blackwood, an African-American Nursing Director at United, offered two critical pieces of testimony that either contradict or call into question Brown's explanation for his selection of Madsen.

First, Blackwood testified that Brown had told her that "the decision to hire [Madsen] as a Lead PA was done before EmCare hired him as the medical director." Blackwood Dep., at 77-78. She went on to explain that Brown also told her that "he [knew] that the PAs [were] upset" after they became aware of the decision to promote Madsen "but [that they should not be upset with Brown] because . . . EmCare made that decision to hire [Madsen] before they hired in Dr. Brown." *Id*. at 78.   Second, Blackwood testified that, on two occasions, Brown had suggested—inaccurately—that Blackwood had told him that she supported his hiring of Madsen. Blackwood testified that, the first time, she and Brown were in the hallway outside the ED when Brown made a comment to her suggesting that she previously had recommended his hiring of Madsen, which she immediately denied. *Id.* at 90, 92-93. Blackwood also related a second encounter with Brown. Brown called her into his office to review a letter that he had written in response to Plaintiffs' EEO claims in which he was prepared to represent that Blackwood had supported his hiring of Madsen, which she again denied. *Id.* at 89 (stating that Brown "had drafted a letter, and he had called me from my office and was reading [the letter] and was trying to put things in as if in support of it, like I had recommended Nate to be hired.  I told him no"); 93-94 ("[H]e had called and was asking

13

me to look at [the letter] and was reading and was trying to, you know, put things in as if I had made recommendations or recommended Nate to be hired. And then I told him, please, do not put me in there because at that point the PAs were – it was a racial."); *see also* 95-97. Blackwood testified that these episodes caused her to complain to a Ms. Faire, the Vice President of Nursing, who was her boss, "because [she] felt as if [she] was being pulled in as a person to be blamed for [Madsen] being hired." *Id.* at 89.

Blackwood's testimony, if credited, could cause a reasonable juror to infer either that: (1) EmCare—and not Brown—made the decision to promote Madsen to the Lead-PA position, in which case Defendants' contention that Brown decided to hire Madsen based on his superior performance ratings is pretext; or (2) even if Brown in fact made the decision to promote Madsen, he did so for reasons—possibly race-motivated—other than he claims. As to the latter inference, for example, a reasonable juror could interpret Brown's disavowal of responsibility as "consciousness of guilt" about the true reason for the promotion. *Cf. Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1293 (D.C. Cir. 1998) ("If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination. . . . This is so because, according to ordinary evidentiary principles . . . a lie is evidence of consciousness of guilt."). Likewise, the two times that Brown tried to "remind" Blackwood that she had previously endorsed Madsen's hiring—when she had not—could reasonably be viewed as an effort to obscure the race-based reason for the promotion by securing the support of an African-American colleague.

Blackwood's testimony, if credited, also potentially raises questions about other aspects of Brown's testimony. For instance, a juror who believes Blackwood might then reasonably question Brown's assertion that he was unaware of the race of all but one of the Plaintiffs when he decided

to hire Madsen, *see* Defs.' Mot. at 15, or his contention that he had considered other, non-white, candidates aside from Madsen for the position, *see id.* at 16-24.  *See Aka*, 156 F.3d at 1293 ("The jury can conclude that an employer who fabricates a false explanation has something to hide; that "something" may well be discriminatory intent.").  "[I]t is clear that summary judgment is particularly inappropriate where credibility is an integral component of a material factual conflict." *Hackley v. Roudebush*, 520 F.2d 108, 159 (D.C. Cir. 1975); *see Moore v. Chesapeake & O. Ry. Co.*, 340 U.S. 573, 576 (1951) ("[I]t is the jury's function to credit or discredit all or part of the testimony.").  Based on Blackwood's testimony, Brown's credibility on key issues could reasonably be called into question.

Defendants contend that Blackwood's testimony does not give rise to a genuine dispute of material fact.  *See* Defs.' Reply at 3-4.  First, they assert that Blackwood "clarified her testimony to make clear that she meant that [the conversations in which Brown deflected responsibility for promoting Madsen] took place before Brown became Medical Director at United." *Id.* at 3 (citing Blackwood Dep. at 79).  It is not entirely clear what Defendants mean by this argument, but they seem to suggest that Blackwood's testimony concerned the decision to hire Madsen in the first place, as opposed to his promotion.  But a review of Blackwood's testimony as a whole makes clear that she stated that Brown had disclaimed responsibility for *promoting* Madsen, not his initial hiring.  *See, e.g.,* Defs.' Reply, Ex. 14, Supplemental Excerpts of Deposition of Janet Blackwood, ECF No. 42-2, at 79 (stating that Brown was referring to the "the lead PA role").  Additionally, Defendants assert that "Blackwood never testified that Brown ever demanded, or even asked, her to sign anything." Defs. Reply at 5.  That may be an accurate recitation of Blackwood's testimony, but she also testified that Brown twice suggested to her that she had endorsed Madsen's hiring, even though she had never done so.  While perhaps not as egregious as asking her to sign a false

document, such behavior could be construed by a reasonable juror as evidence of an attempt by Brown to conceal the true motive for his decision to promote Madsen.

Because Blackwood's testimony gives rise to a genuine dispute about Brown's reasons for promoting Madsen, the court must deny EmCare and Provo's motion for summary judgment on Plaintiffs' Title VII and Section 1981 discrimination claims.[4]

### 2. *Individual Defendants Brown and Korando*

The court turns next to Plaintiffs' Title VII and Section 1981 claims against Defendants Brown and Korando. As an initial matter, it is clear that there can be no individual liability against them under Title VII, as that statute only applies to employers. *Gary v. Long*, 59 F.3d 1391, 1399 (D.C. Cir. 1995). Accordingly, the court grants Defendants' motion for summary judgment on Plaintiffs' Title VII failure-to-promote claim as to the individual defendants. *Id*.

The court reaches different decisions regarding Plaintiffs' Section 1981 claims against the individual Defendants. To establish individual liability under Section 1981, a plaintiff must demonstrate that the individual defendant was personally involved in the alleged discriminatory activity. *Brown v. Children's Nat. Med. Ctr.*, 773 F. Supp. 2d 125, 136 (D.D.C. 2011). Here, Plaintiffs have offered minimal evidence of Korando's participation in the decision to promote Madsen—only that she provided resumes and performance data to Brown and recommended two PAs for the position, one white (Madsen) and one African-American (Chandon-Cooke). Defs.' Stmt. ¶ 86. Such evidence is not sufficient to give rise to individual liability for Korando under Section 1981.

---

[4] At this juncture, it is not clear to the court on what basis EmCare, which did not employ Brown, could be held liable under Title VI or Section 1981 for his conduct. Provo's potential liability is clear—it was Brown's employer. *See* Defs.' Stmt. ¶ 31. The basis for EmCare's liability is less so. The court need not, however, resolve that issue at this time because EmCare has not moved for summary judgment on the ground that it is not liable for Brown's actions.

The court, however, reaches the opposite conclusion as to Brown.  His personal involvement in the alleged discriminatory promotion decision is not genuinely in dispute. Defendants argue that, by relying on Blackwood's testimony, Plaintiffs now take the position that EmCare, and not Brown, made the decision to promote Madsen.  Defs.' Reply at 6 ("Plaintiffs can't have their cake and eat it too.  Either Dr. Brown, as he testified, participated in the decision or he did not.").  The court does not, however, necessarily understand Plaintiffs to now take the position that Brown did not make the promotion decision.  Instead, it appears that Plaintiffs are contending that Brown's statements disavowing responsibility for the promotion are evidence of discriminatory intent.  If Plaintiffs were to take the affirmative position at trial that only EmCare personnel, and not Brown, made the decision to promote Madsen, then the court would grant judgment in favor of Brown at that point.  However, to do so now would be premature. Accordingly, Brown's motion for summary judgment as to Plaintiffs' Section 1981 claim is denied.

### B.  Retaliation Claims

The court now turns to Plaintiffs' retaliation claims.  Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Likewise, in *CBOCS West, Inc. v. Humphries*, the Supreme Court held that Section 1981 also covers "retaliation against a person who has complained about a violation of another person's contract-related 'right.'" 553 U.S. 442, 452 (2008).  "To bring a claim for retaliation under Title VII or Section 1981, Plaintiff must allege that he engaged in a statutorily protected activity, that his employer took an adverse personnel action against him, and that a causal

connection exists between the two." *Jones v. Dist. of Columbia. Water & Sewer Auth.*, 922 F. Supp. 2d 37, 41 (D.D.C. 2013) (citing *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998)).

1.    *The Change in the PA Compensation Structure*

Although most discrimination cases that reach federal court contain no dispute that the employee has suffered an adverse employment action, *see Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008), this is not such a case.   Defendants here contend that Plaintiffs have not suffered an adverse employment action and thus have not made out even a *prima facie* case of retaliation.   Defs.' Mot. at 29.   Therefore, before asking whether a reasonable jury could infer retaliation from all of the evidence, the court must determine whether Plaintiffs experienced the kind of adverse employment action protected by Title VII and Section 1981.

The court concludes that they have not.   To come within the either statute's protection against retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse."   *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 68 (2006); *Browne v. Potomac Elec. Power Co.*, No. CIV.A. 05-1177 (RWR), 2006 WL 1825796, at *2 (D.D.C. July 3, 2006) (applying the same to Section 1981 claims).   In this context, an action is "materially adverse" if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   *Burlington* 548 U.S. at 68 (internal quotations omitted) (citation omitted).   Thus, the standard is an objective one.   *Id.*

Plaintiffs argue that Brown's threat to invoke the "at-will" termination clause for those PAs who refused to accept the change in compensation was in retaliation for Plaintiffs' filing of discrimination complaints.   Pls.' Opp'n at 62-63.[5]   But that threatened action cannot qualify as

---

[5] Plaintiffs do not argue that the new compensation system itself was retaliatory.   *See* Pls.' Opp'n at 62.

unlawful retaliation in this case because EmCare immediately cured whatever adverse effects resulted from that action prior to this litigation. *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (holding "[a]n employer may cure an adverse employment action . . . before that action is the subject of litigation."). Specifically, EmCare allowed Plaintiffs to elect either the new or old pay systems and compensated some of them for all lost wages. Defs.' Stmt. ¶¶ 50, 68, 83, 124. Accordingly, summary judgment will be granted in favor of Defendants on Plaintiffs' Title VII and Section 1981 retaliation claims.

### 2. *Plaintiff Ofwono's Retaliation Claim*

Plaintiff Ofwono has asserted a separate retaliation claim based on her termination soon after she filed her EEO claims. Because Defendants have provided a legitimate non-discriminatory reason for terminating Ofwono—namely, that she lied about the reasons for missing her shift at the United ED on January 12, 2013, *see* Defs.' Mot at 34—the burden-shifting framework of *McDonnell Douglas* is no longer relevant, and the court must determine whether a reasonable jury could infer retaliation from all evidence presented byboth parties, *see Nurriddin*, 818 F.3d at 758-59; *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). The court reiterates that, in doing so, it must consider the "three relevant categories of evidence—prima facie, pretext, and any other—to determine whether they either separately or in combination provide sufficient evidence for a reasonable jury to infer retaliation." *Jones*, 557 F.3d at 679 (internal quotations omitted) (citations omitted).

Even when drawing all inferences in Ofwono's favor, no reasonable jury could conclude that her EEO complaints were the but-for cause for her termination. *See Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (holding that "Title VII retaliation

claims must be proved according to traditional principles of but-for causation").[6]  Here, Ofwono

has cited to no actual evidence to support her claim.  She has offered nothing more than the

unsupported assertion—her briefing cites to no record facts—that her firing was an "overreaction"

and that double-shift errors are common.  *See* Pls.' Opp'n at 50.  Indeed, she does not even deny

that she called in sick but then worked the same shift at another hospital.  *See id.*  Accordingly,

summary judgment will be granted in favor of Defendants on Plaintiffs' Title VII and Section 1981

retaliation claims relating to Plaintiff Ofwono's termination.

### C.    Breach of Contract Claims

The final issue before the court is Plaintiffs' breach-of-contract claim.  Defendants argue

that Plaintiffs' claim should be dismissed for failure to adequately allege damages because

EmCare:  (1) never actually invoked the "at-will" termination clause, and (2) cured any potential

injury by fully reimbursing all lost wages.  As Plaintiffs have failed to respond to these arguments,

the court will treat them as conceded.  *See Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C.

2010) ("It is well established that if a plaintiff fails to respond to an argument raised in a motion

for summary judgment, it is proper to treat that argument as conceded."); *Sykes v. Dudas*,

573 F. Supp. 2d 191, 202 (D.D.C. 2008) ("[W]hen a party responds to some but not all arguments

raised on a Motion for Summary Judgment, a court may fairly view the unacknowledged

arguments as conceded.").

---

[6] While courts in this circuit have recognized the disagreement among other circuits regarding whether *Nassar* applies to Section 1981 claims, *see Jones v.* 2016 WL 659666 at *6 , our Court of Appeals has not yet weighed in on the issue, *id*.  The court need not decide this issue at present, as Plaintiffs have failed to allege sufficient facts to support a retaliation claim even under the arguably more relaxed "motivating factor" standard.  *Id*.

## IV.    CONCLUSION AND ORDER

For the foregoing reasons, the court grants in part and denies in part Defendants' Motion

for Summary Judgment.   The court denies Defendants Provo and EmCare's motion with respect

to Plaintiffs' failure-to-promote claims under Title VII and Section 1981.   The court also denies

the motion as to Defendant Brown under Section 1981.   The motion is granted in all other respects.

Dated:  September 2, 2016                                     Amit P. Mehta
                                                             United States District Judge